# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### EASTERN DIVISION

| | | |
|---|---|---|
| NELDA DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 1:05-cv-1284-T-An |
| | ) | |
| MORNINGSIDE OF JACKSON, L.L.C., | ) | |
| d/b/a MORNINGSIDE ASSISTED | ) | |
| LIVING OF JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

---

### AMENDED ORDER DENYING DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT
### AND
### GRANTING DEFENDANT'S ALTERNATIVE MOTION TO STAY FURTHER PROCEEDINGS AND TO COMPEL ARBITRATION

---

The court hereby amends[1] its Order of March 27, 2006 by substituting the following Amended Order in its entirety:

Defendant Morningside of Jackson, L.L.C., d/b/a Morningside Assisted Living of Jackson ("Morningside"), seeks a judgment dismissing Plaintiff Nelda Davis's ("Davis"'s) claims for retaliatory discharge under Tennessee law.  Morningside argues that Davis's claims are time-barred pursuant to a ninety (90) day time limit prescribed by an arbitration agreement that Davis signed when she began working for Morningside.  Morningside also moves, in the alternative, for an order staying Davis's action and compelling the parties to

---

[1]The Order of March 27, 2006 contains typographical errors on pages 4, 21, and 24.

arbitrate in accordance with the agreement.  Davis seeks relief from the purported agreement, contending that it is really no agreement at all because: (1) it is an unconscionable adhesion contract under state law, (2) it does not provide an effective alternative forum for the vindication of Davis' rights because of the potential costs of arbitration, and (3) the ninety (90) private statute of limitations is conscience-shocking *per se*.

After considering the exhibits and the arguments of counsel, together with the applicable legal precedent, the court concludes that the arbitration clause is valid.  First, Davis did not demonstrate satisfactorily that the arbitration clause is "adhesive" as that term of art is understood by Tennessee courts and by federal courts applying Tennessee law. Second, and although this issue is closer than Morningside acknowledges, Davis's prima facie "proof" of likely prohibitive arbitration costs in this case was insufficient to trigger Morningside's duty to produce contrary evidence.[2]  *See Green Tree Fin. Corp. of Alabama v. Randolph*, 531 U.S. 79, 90  n.6 (2000) ("These unsupported statements [regarding typical arbitrator's fees] provide no basis on which to ascertain the actual costs and fees to which she would be subject in arbitration[]").  There simply is no factual basis upon which to find that a substantial number of comparable plaintiffs would choose to forego the arbitration process envisioned by the arbitration clause because of the potential costs.

I.

---

[2]Moreover, Davis has had an adequate opportunity to research the initial burden of production and to assemble the necessary evidence.  Davis was allowed a total of two months to respond after Morningside first raised the arbitration issue, and she most likely would have been granted an additional amount of time had she requested.

Defendant Morningside is an assisted living facility located in Jackson, Tennessee. On April 26, 2004, Morningside hired Davis as Executive Director. Compl. ¶ 5. Her starting salary in that position was $2,115.39 every two weeks. Morningside's Ex. 1-A. On the date she was hired, she was presented with a variety of documents to sign, including an Associate Arbitration Agreement. Davis Aff. ¶ 4; Morningside's Ex. 1-B ("Arbitration Agreement"). Davis remembers that she was not given an "opportunity" to read the Agreement, that the legal significance of the Agreement was not explained, that she was not given an "opportunity" to ask questions about the Agreement, and that she was not given a copy of the Agreement to take home. Davis Aff. ¶ 4. She was not reminded of the Agreement when Morningside terminated her employment. *Id.* ¶ 5.

The Arbitration Agreement was presented as a separate form and it took up more than one-half of a letter-sized piece of white paper. *See* Arbitration Agreement; Def.'s Mem., Ex. 1-B. The Arbitration Agreement stated, in relevant part:

### Associate Arbitration Agreement

By accepting employment with the Company, each associate agrees that any controversy or claim arising out of or relating to the associate's employment . . . including, but not limited to, claims under any applicable statute . . . shall be submitted to arbitration in Nashville, Tennessee, *no later than three months following the termination* of such associate's employment[.] [The arbitration shall be heard] before a board of three (3) arbitrators, one to be selected by the Company, one by the associate, and the other by the two persons so selected, *all in accordance with the labor arbitration rules of the American Arbitration Association then in effect*. . . .

. . . .

*. . . . [E]ach party agrees that these arbitration provisions shall provide it with its exclusive remedy against the other party . . . and each party expressly waives any right it might have to seek redress in another forum except as provided herein.*

The parties further agree that the arbitrators acting hereunder shall be empowered to assess no remedy other than that which may be imposed by a court of competent jurisdiction, *the expenses of the neutral arbitrator and the Company and the associate.  Each party shall bear the expense of the arbitrator selected by it and of any witnesses it calls.*

. . . .

**By signing this document, the Associate is agreeing to give up his or her right to submit discrimination claims to a jury or court.**  *Within two weeks [of] signing this document, the Associate has the right to revoke the arbitration provision.*

[Signature by Davis]
[Davis's name printed by Davis]

Arbitration Agreement; Def.'s Mem., Ex. 1-B (bold letter-type in original; emphases of key provisions added).

Davis claims that, until she became Executive Director, Morningside was guilty of mistreatment of patients in that "Defendant routinely and continually kept and retained residents who, due to declining health, should have been placed in facilities more appropriate and more capable of caring for the residents."  Compl. ¶ 6.  In her position as Executive Director, Davis began to discharge individual patients to other facilities despite contrary orders from above.  *Id.* ¶¶ 7, 8.  Davis avers that she was attempting to comply with state laws and procedures governing assisted living facilities and that she continually attempted to speak out and to remedy the situation.

On September 2, 2004, Morningside terminated Davis.  Davis. Aff. ¶ 5.  Davis

believed, and believes, the substantial or sole motivating factor for the termination was to retaliate against her for opposing Morningside's allegedly illegal operations.  Compl. ¶ 13. On August 31, 2005, she filed a complaint against Morningside claiming that her discharge violated Tennessee public policy embodied in the Tennessee Public Protection Act, TENN. CODE ANN. § 50-1-304, *et. seq.*, and Tennessee common law.  *Id.* ¶ 14.  She sought back pay, front pay, compensatory damages in the amount of $500,000.00 and punitive damages in the amount of $1,000,000.00, prejudgment interest, attorney fees, and costs.  *Id.* ¶ 16.  She continues to insist that she did not have a copy of the Arbitration Agreement, and was not aware of its existence, either at the time she was fired or by the time the complaint was filed. Davis Aff. ¶¶ 5, 6.[3]

Morningside removed the state-court action to this court on September 28, 2005, relying on the parties' diverse citizenship and on the amount of money in controversy.  *See* 28 U.S.C. § 1441(a).  On November 10, 2005, Morningside then filed this Motion to Dismiss, or in the Alternative for Summary Judgment; or in the Alternative to Stay Further Proceedings and to Compel Arbitration.  In support of its motion, Morningside contends that the Arbitration Agreement is valid and enforceable, and that Davis's claims are time-barred under the ninety (90) day time limit provided in the agreement for the filing of claims in the arbitral forum.  It seeks an order dismissing the claims as untimely or granting summary judgment on that ground; alternatively, Morningside requests that the court at least grant a

---

[3]Furthermore, Davis states that she did not draft the arbitration agreement, that she would not have signed it if she had known about it, and that the subject of arbitration was never even mentioned while she worked for Morningside.

stay of the proceedings and compel the parties to proceed into arbitration (where Morningside presumably will again raise the time limit). Davis, however, argues that the Arbitration Agreement is not valid and enforceable because of: (1) adhesiveness and unconscionable terms under state law, and (2) the likely prohibitive costs of arbitration. Conscious of Morningside's intent to rely on the time limit, Davis asserts that: (1) the time limit is itself one of the unconscionable terms and must be excised, or (2) because there is no severability provision in the purported agreement, the court must invalidate the agreement *in toto* irrespective of which individual provisions are found offensive.

## II.

The parties agree that the employment relationship between Davis and Morningside "involv[ed] commerce" and was subject to the broad, preemptive provisions of the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. §§ 1–16. *See also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995) (holding that the parties to a contract need not contemplate that their transaction affects interstate commerce to trigger the FAA); *Perry v. Thomas*, 482 U.S. 483, 490 (1987) (interpreting the FAA to embody Congress' intent to reach as many transactions as the Commerce Clause allows). The Act provides, in relevant part, that, "[a] written provision [within an employment contract subject to the FAA] to settle by arbitration a controversy thereafter arising out of [the employment relationship], . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." FAA, § 2. The purpose of the Act is to declare a liberal federal policy in favor of agreements to arbitrate, *Perry*, 482 U.S. at 489, and to remove the

6

states' power to require the judicial resolution of disputes even if consenting parties have agreed to resolve their disputes in an arbitral forum, *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). Section 2, in particular, "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the act," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and irrespective of whether the dispute arises in state or federal court, *Southland*, 465 U.S. at 12 ("Federal law . . . governs [the] issue [of arbitrability] in either state or federal court.").

Although the Act, if applicable, transforms the validity of an arbitration agreement into a threshold federal law issue, that federal issue frequently may be resolved by reference to state law. *Perry*, 482 U.S. at 492 n.9 (referring to the "choice of law" issue that the text of section 2 of the FAA leaves "between state-law principles and the principles of federal common law envisioned by the passage of that statute"). That is, by making the federal common law issue—the validity, revocability, and enforceability of a FAA-governed arbitration agreement—subject to "such grounds as exist at law or in equity for the revocation of *any* contract," *id.* (citing section 2 of the Act), Congress did not prohibit the application of state laws that " 'arose to govern issues concerning the validity, revocability, and enforceability of contracts *generally*,'" *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 686–87 (1996) (emphasis added) (quoting *Perry*'s observation, and distinguishing state laws that either facially or in their application treat arbitration agreements as "suspect"). "Thus, generally applicable [state law] contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's*

7

*Assocs.*, 517 U.S. at 681 (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995); *Perry*, 482 U.S. at 489 n.9).  As a matter of federal arbitration law, however, any doubt about the state law's application should be resolved in favor of arbitration.  *See Glazer v. Lehman Bros.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

A.

Seeking to avoid enforcement of the Arbitration Agreement, Davis relies first on Tennessee's generally applicable contract rule that courts should not enforce contracts of adhesion containing unconscionable or oppressive substantive terms.  She argues that the Arbitration Agreement was adhesive and unconscionable because it was presented for her signature by a party with superior knowledge and bargaining power, in boilerplate language, and on a take-it-or-leave-it basis.[4]  Second, she adds that the ramifications of signing the Arbitration Agreement were not discussed with her at the time she signed and that she was not given a copy of the Agreement or encouraged to seek advice from a lawyer regarding the Agreement.  Third, she claims that the Arbitration Agreement omitted "critical information" because it did not "advise" her of the costs of arbitration or that she was waiving her constitutional right to trial by jury.  Finally, she contends that the ninety (90) day time limit in the Agreement is substantively unconscionable *per se*.

Davis's claim that the Agreement was adhesive is incompatible with generally

---

[4]By "take-it-or-leave-it," Davis means that Morningside would not have negotiated with her over the terms of the Arbitration Agreement; if she wanted to work for Morningside, she had no choice but to sign the Agreement as drafted by Morninside, or Morningside's attorneys.

applicable Tennessee contract law.  A contract of adhesion in Tennessee has been defined as "a standardized contract form offered . . . on essentially a 'take it or leave it' basis, without affording the [offeree] a realistic opportunity to bargain and under such conditions that the [offeree] cannot obtain the desired [contractual benefit] except by acquiescing to the form of the contract."  *See Buraczynski v. Eyring*, 919 S.W.3d 314, 320 (Tenn. 1996) (citing BLACK'S LAW DICTIONARY 40 (6th ed. 1990)).  Although, as Davis stresses, adhesion contracts typically *involve* boilerplate, take-it-or-leave-it terms offered by a "superior" party, *id.*, the "distinctive" indicia of a true adhesion contract is that "the weaker party has no realistic choice as to [the] terms," *id.* (internal quotation marks and citations omitted).  Davis cannot show the absence of a meaningful choice in the instant case because she has not shown the meaninglessness of the choice she presumably had to seek alternative employment if she could not agree to the terms of the Arbitration Agreement with Morningside.  This emphasis on choice and the conclusion that follows are compelled by a number of pertinent cases interpreting and applying Tennessee contract law.  *See e.g., id.* (finding adhesiveness in an arbitration agreement despite patient's presumptive choice to seek out a different physician, but emphasizing that this choice was not a *realistic* one on the facts because there had been an ongoing physician-patient relationship between the parties when the agreement was signed); *see also Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687–88 (Tenn. 1996) (applying *Buraczynski* and finding account agreement between bank and customer not adhesive because customer did not show "[allegedly unconscionable overdraft] fees were the same at all the defendant banks or that banking services could not be obtained from other

institutions"); *Vickery Transp., Inc. v. Hepaco, Inc.*, No. W2003-01512-COA-R3-CV, 2004 Tenn. App. LEXIS 665, at *11–12 (Tenn. Ct. App. Oct. 4, 2004) (rejecting claim of adhesiveness in contract between transportation company and contractor "because there was insufficient evidence that [the company] had no alternative to executing the Agreement"), *perm. app. denied*, 2005 Tenn. LEXIS 285 (Tenn. Mar. 21, 2005); *Raiteri ex. rel. Cox v. NHC Healthcare/Knoxville, Inc.*, No. E2003-00068-COA-R9-CV, 2003 Tenn. App. LEXIS 957, at *26 (Tenn. Ct. App. Dec. 30, 2003) (finding no realistic choice but to sign a hospital admission agreement where husband of patient "was handed a form contract, under, what was for him, very trying circumstances, *i.e.*, his need to quickly find accommodations for his ailing wife"); *Thompkins v. Helton*, No. M2002-01244-COA-R3-CV, 2003 Tenn. App. LEXIS 433, at *12 (Tenn. Ct. App. June 12, 2003) (rejecting claim of adhesiveness in release-and-waiver agreement between motor speedway and spectator because spectator had a choice not to enter restricted area), *perm. app. denied*, 2003 Tenn. LEXIS 1273 (Tenn. Dec. 22, 2003); *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 735 (Tenn. Ct. App. 2003) (finding a nursing home admission agreement adhesive because patient "had to be placed in a nursing home expeditiously"), *perm. app. denied*, 2003 Tenn. LEXIS 632 (Tenn. June 30, 2003); *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 359 (Tenn. Ct. App. 2001) (affirming trial court's conclusion that an arbitration agreement between car dealer and buyer not adhesive because "[p]laintiff could have gone to another Chevrolet dealership . . . and obtained a van elsewhere if he considered the Agreement unacceptable"); *Wilson Pharm. Inc. v. General Computer Corp.*, No. E2000-00733-COA-R3-CV, 2000 Tenn. App.

10

LEXIS 648, at *10–11 (Tenn. Ct. App. Sept. 21, 2000) (applying *Buraczynski* and affirming decision that contract between pharmacy and computer corporation not adhesive because court did not "believe the statements in the affidavit . . . that he did not know of any other computer corporation which would provide a comparable service); *Howell v. Rivergate Toyota, Inc.*, 144 Fed. App'x 475, 478 (6th Cir. July 25, 2005) (unpublished) (applying *Buraczynski* and rejecting claim that arbitration agreement in employment contract was adhesive because there was no "specific evidence that [plaintiff] could not have found other suitable employment"); *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 384 (6th Cir. 2005) (expressing doubt that an employment-arbitration agreement was adhesive because trial court did not cite evidence that the plaintiffs could not have found suitable employment if they had refused to sign), *cert. denied*, 126 S.Ct. 730 (2005); *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 502 (6th Cir. 2004) (counseling against substituting "[g]eneralizations about employer practices in the modern economy" for "evidence that Cooper would be unable to find suitable employment if she refused to sign MRM's agreement").

Determining whether a contract is adhesive is fact-intensive, but, as the cited cases demonstrate, a threshold, and often determinative, factor is the presence or absence of a realistic choice a person has between signing and not signing a particular agreement.  Despite this well-established legal meaning of the term "adhesion contract," *see supra*, at 6–8 (citing numerous cases), however, Davis did not present any evidence suggesting that she would have been incapable of securing alternative employment had she exercised her presumptively realistic right not to consent to the Arbitration Agreement.  Therefore, her claim that the

Agreement was adhesive is unpersuasive, and it is unnecessary to consider her unconscionability claim any further.

What really motivates Davis's challenge to the Arbitration Agreement, which she analyzes as an adhesiveness issue, is her sworn declaration that "[she] was not given an opportunity to read . . . the documents." Davis Aff. ¶ 4; *see also id.* ¶¶ 4–13 (Davis declaring that the Agreement was not explained, she was not given "choice" to ask questions, she was not aware of Agreement until after Morningside raised the issue, she was not given a copy, etc.). To be sure, there is language in some Tennessee cases suggesting that these facts, if believed, might make the choice not to sign less "*meaningful*" under *Buraczynski*. *See, e.g., Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 359 (Tenn. Ct. App. 2001) (discussing similar facts in the context of applying *Buracynski*). But the precise legal issue implicated by these alleged facts is whether the Arbitration Agreement constituted a "knowing and voluntary waiver" of Davis's various rights. *See e.g., Chapman v. H & R Block Mortg. Corp.*, No. E2005-00082-COA-R3-CV, 2005 Tenn. App. LEXIS 737, at *12–16 (Tenn. Ct. App. Nov. 28, 2005) (collecting Tennessee cases).

Even assuming the truth of the alleged facts, Davis's effort to invalidate the Agreement would have fared no better for her under the rules for determining when a waiver is knowing and voluntary than it did under Tennessee's definition of adhesion contract. In Tennessee, one who signs a contract without reading it may not subsequently seek revocation on the ground that, because he never knew what the contract said, the waiver was not done knowingly. In *Giles v. Allstate Ins. Co.*, for example, the Court of Appeals of Tennessee

reaffirmed the traditional rule that: "if, without being the victim of fraud[,] [one] fails to read [a] contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, [and] will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence."  871 S.W.2d 154, 157 (Tenn. Ct. App. 1993) (several citations omitted).  As Davis does not allege any fraud or other specific misconduct of Morningside that caused her to sign the Arbitration Agreement without reading it, it would appear that she is conclusively presumed to have knowingly and voluntarily agreed to all of the Agreement's contents even if she never read the Agreement.

Albeit in the context of a waiver of federal statutory claims, the Court of Appeals for the Sixth Circuit, in *Morrison v. Circuit City Stores*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc), adopted a less formalistic approach, but that approach also does not favor Davis.  In *Morrison*, the court of appeals held that, "[i]n evaluating whether a [waiver] has been knowingly and voluntarily executed, [courts should] look to: (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances."  *Id.* (internal quotation marks and citations omitted); *see Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 381 (6th Cir. 2005), *cert. denied*, 126 S.Ct. 730 (2005) (applying *Morrison*).  In *Walker v. Ryan's Family Steak Houses, Inc.*, the Sixth Circuit applied this test and affirmed a district court's finding that a waiver of the right to litigate had not been knowingly and voluntarily waived because: (1) most of the plaintiffs

had not completed high school and were in "dire financial circumstances" when they signed the arbitration provision; (2) plaintiffs were hired "on the spot after a brief interview, during which the hiring manager hurriedly presented them with various documents that they were instructed to sign in order to be considered . . . "; (3) when the agreements were discussed at the interview, the managers provided misleading information; (4) the plaintiffs' limited educations and the misleading information combined caused plaintiffs to have "confused interpretation[s]" of the waiver language; (5) there was no consideration for the waiver; and (6) the totality of the foregoing circumstances supported the trial court's decision. 400 F.3d at 381–82. In contrast, in Davis's case the totality of the circumstances supports the opposite result.

First, Davis presented no evidence regarding her educational or financial status at the time she signed the arbitration agreement. Thus, the court cannot conclude that she was "low to mid level" at that time. *Id.* at 381. Second, unlike the plaintiffs in *Walker*, Davis was given an unequivocally expressed right to revoke the arbitration agreement within two weeks of signing it, *see* Arbitration Agreement, during which time she certainly could have discussed the agreement with an attorney. Granted, the right to revoke may have been less real to Davis if she did not know that such a right existed, and the evidence does somewhat suggest that Davis was "hurriedly presented . . . with various documents that she was instructed to sign" and was never given a copy of the Agreement; but, there is also no suggestion that Morningside's agents took any affirmative action, other than being in a hurry generally, to interfere with or obstruct Davis's "opportunity" to learn the contents of the

14

documents she signed.  The evidence does not, for example, suggest that Morningside would not have allowed Davis to take a copy home or to slow the process of signing in order to inform herself before waiving her rights.  Even if this factor favors Davis, moreover, the remaining factors do not: there is no evidence that Morningside misled Davis about the meaning of the Agreement, and the waiver in the Agreement—**By signing this document, the Associate is agreeing to give up his or her right to submit discrimination claims to a jury or court**—was neither ambiguous[5] nor inconspicuously located.[6]  Finally, the Agreement is supported by adequate consideration; Morningside waived its right to litigate its claims in court in exchange for Davis's promise to do the same, and there is no indication that Morningside's end of this exchange was illusory or otherwise not binding on Morningside. *Contra Walker*, 400 F.3d at 380 ("[W]e question whether the agreement . . . even obligates Ryan's to submit to [the] arbitral forum at all."); *id.* at 379 ("The[] agreements explicitly reserve [to one party] the right to modify or amend the rules from time to time, without providing [the other party] the right to insist on the rules in effect at the time that they executed their respective agreements.").  The totality of the circumstances thus supports a finding that Davis knowingly and voluntarily waived her right to litigate these claims in a court of law.

    In summary, the court finds that the Arbitration Agreement was not a contract of

---

[5]In light of the highlighted language, it is difficult to understand Davis's claim that "the arbitration agreement does not advise [her] that . . . her right to trial by jury" would be waived.  *See* Pl.'s Mem. at 2.

[6]The waiver was contained directly above Davis's signature on the Agreement.

adhesion and that Davis knowingly and voluntarily consented to the terms of the Agreement—including the term requiring her to submit claims to arbitration within ninety (90) days of termination.  While the court generally agrees that this period of time is brief, the court is aware of no authority (and Davis does not provide any) holding that ninety (90) days is *per se* "unreasonable."  *See Howell v. Rivergate Toyota, Inc.*, 144 Fed. App'x 475, 479 (6ᵗʰ Cir. July 25, 2005) (unpublished) (rejecting general claim that one-hundred and eighty (180) day time limit was "manifestly unfair"); *Morgan v. Town of Tellico Plains*, No. E2001-02733-COA-R3-CV, at *10 (Tenn. Ct. App. Oct. 30, 2002) (noting, in a case involving sixty (60) day time limit, the "well established general rule that in the absence of a prohibitory statute, a contract provision is valid which limits the time for bringing suit, if a reasonable period of time is provided[.]").

## B.

An arbitration agreement must ensure that the employee retains the real capacity to "effectively . . . vindicate [his or her] . . . cause of action" in the arbitral regime contemplated by the agreement.  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) (internal quotation marks and citations omitted) (regarding federal statutory claims).  In *Green Tree Fin. Corp. of Alabama v. Randolph*, the United States Supreme Court acknowledged that employers might use financially prohibitive costs to deter employees from bringing arbitration claims, while at the same time foreclosing the employees' rights to litigate in court.  531 U.S. 79, 90 (2000).  Because the evidentiary record in *Green Tree Fin. Corp.* regarding the likely costs of arbitration was insufficient under any standard of proof,

16

however, the Court did not attempt to define "[h]ow detailed the showing of prohibitive expense must be" before finding that a particular arbitral scheme is an ineffective alternative to litigation. *Id.* at 92. The Court did make clear, on the other hand, that "a party [who] seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive . . . bears the [initial] burden of showing the likelihood of incurring such costs." *Id.* If that party meets this initial burden, the other party must come forward with "contrary evidence." *Id.*

In *Morrison, supra*, the Sixth Circuit discussed in detail the gaps deliberately left open by *Green Tree Fin. Corp.*, and the court of appeals in *Morrison* indeed provided a significant amount of guidance to potential litigants and trial courts alike regarding the burden-shifting framework envisioned by the Supreme Court. The court of appeals first derived:

> [t]he following propositions of law . . . from *Green Tree*: First, in some cases, the potential of . . . large costs . . . will deter potential litigants from seeking to vindicate their rights . . . . Second, where that prospect [is likely], the arbitration agreement, or, at a minimum, the cost-splitting provision contained within it, is unenforceable . . . . Third, the burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

*Morrison v. Circuit City Stores*, 317 F.3d 646, 659 (6th Cir. 2003)(en banc). Noting that *Green Tree Fin. Corp.* had involved an agreement that simply had begged the question of cost, the court of appeals then endeavored to discover the "appropriate standard for determining whether a[n] [express] cost-splitting provision contained in an arbitration agreement is invalid." *Id.* at 660. The court rejected a case-by-case analysis that would have

required a plaintiff to show "concrete estimates of anticipated or expected arbitration costs . . . at [the] initial stage of the proceedings," and would have focused solely on the individual plaintiff and not on the "chilling effect" the costs-provision might have on others similarly situated. *Id.* at 660–61; *see also id.* at 663 ("A particular plaintiff may be determined to purse his or her claims[.]").  On the other hand, the court also dismissed as "superficially attractive" the opposite approach, which would have relied on *post hoc* judicial review to ensure that an arbitral forum had been an effective substitute; this approach, said the majority, was a disservice to the deterrence-based rationale because the *prohibitive*-cost issue would always be *moot* as to the individual plaintiff who had already arbitrated his claim notwithstanding cost.  *Id.* at 662 ("After the plaintiff has arbitrated her claims, reviewing courts will not likely determine that this risk [of costs] deterred the plaintiff[]" from filing the claim in arbitration).  The balance the court struck between these approaches produced the "revised case-by-case" rule that: "potential litigants must be given an opportunity, *prior to* arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them *and similarly situated individuals* from seeking to vindicate their . . . rights in the arbitral forum."  *Id.* at 663.  (emphases added).  The focus is on the prospective litigant's decision-making process and the effect of the *terms of the agreement* on that process; therefore, courts should "discount the possibilities that the plaintiff [ultimately] will not be required to pay costs or arbitral fees" in the particular case.  *See id.* at 664–65 ("[M]any will be inclined to err on the side of caution[.]").

        This deterrence-based analysis calls for "defining the class of such similarly situated

18

potential litigants by job description and socioeconomic background," *id.* at 663, and determining the "average or typical arbitration costs" *relative to* litigation, *id.* at 664. "[I]n many cases, it might be concluded that . . . there is little or no difference between the judicial and arbitral fora—*with one important exception*." "In the arbitral forum, the litigant faces an additional expense—the arbitrator's fee and costs—which are never incurred in the judicial forum." The question is whether this added cost will be borne by the plaintiff and whether that expense, combined with the other costs associated with arbitrating, are so potentially high that a substantial number of comparable potential litigants will not file at all. *Id.* (emphasis added).

The roadmap outlined in *Morrison*, however, does not necessitate a "detailed analysis of the household budgets of low-level employees," *id.*, and it does not demand evidence of the *precise* costs that a potential litigant will incur if he files in the arbitral forum, *id.* at 660 (criticizing such an approach). In fact, according to the court of appeals, its guidelines most likely would simply tie the result of a given case to the plaintiff's general socioeconomic status at the time the dispute arises. In cases not involving "high-level managerial employees and others with substantial means," the Sixth Circuit predicted, its standard would "render cost-splitting[7] provisions *unenforceable in many, if not most, cases*." *Id.* at 665 (emphasis added). *See also Scovill v. WSYX/ABC, Sinclair Broadcast Group, Inc.*, 425 F.3d 1012,

---

[7]It might be argued that this case involves a cost-*shifting*, rather than a cost-splitting, provision. *But see* Arbitration Agreement (defining arbitrator's power to shift *expenses*). *See Scovill v. WSYX/ABC, Sinclair Broadcast Group, Inc.*, 425 F.3d 1012, 1021 (6th Cir. 2005), *petition for reh'g en banc denied*, 2006 U.S. App. LEXIS 1879 (6th Cir. Jan. 10, 2006).

1020–21 (6th Cir. 2005) (suggesting that cost-*shifting* provisions may be more suspect than pure cost-splitting provisions under *Morrison*'s deterrence rule), *petition for reh'g en banc denied*, 2006 U.S. App. LEXIS 1879 (6th Cir. Jan. 10, 2006); *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 509, 511–13 (6th Cir. 2004) (reiterating *Morrison*'s prediction in case involving a plaintiff with an annual income of approximately $7,000.00, but remanding for reconsideration of likely deterrent effect in light of amended cost rules of American Arbitration Association).

The court nevertheless finds that, however slight *Morrison* makes a plaintiff's initial burden to show likely prohibitive costs, Davis has not met even the slightest such burden here. Davis relies on an inapplicable, outdated version of the American Arbitration Association's ("AAA"'s) rules to compute the likely basic costs of arbitrating; with respect to arbitrator compensation in particular, she does not even cite an "article" to estimate the likely cost of such compensation, *see Green Tree Fin. Corp.*, *supra*, at 90 n.6 (finding that a stray remark in an "article" regarding average arbitrator compensation was an insufficient evidentiary showing of prohibitive cost). "[T]o invalidate the agreement on [such a speculative] basis would undermine the liberal federal policy favoring arbitration agreements." *Id.* (internal quotation marks and citation omitted).

The Agreement in this case gives the arbitrators the power to assess any remedy that could be imposed by a "court of competent jurisdiction." The Agreement contemplates three individual arbitrators—one neutral, one chosen by Davis, and one chosen by Morningside;

in general, each party is responsible for the *expenses* of its own witnesses and its own arbitrator (assuming the arbitrators do not "assess" that "remedy" on the other party). The Agreement appears to be completely silent on the issue of arbitrator *compensation*. Nothing about the terms of the Agreement justifies a finding of prohibitive costs. *See id.* at 92 (holding that agreement's silence as to costs is insufficient).

The AAA's labor arbitration rules now "in effect," *see* Arbitration Agreement, also do not satisfy Davis's prima facie burden on likely costs, *see* Def.'s Reply Mem., Ex. 3 §§ 4 (filing fee at initiation of arbitration capped, on the next page, at $125.00 in claims before three arbitrators), 39 (travel and expenses of arbitrator, AAA representatives, and any witness and the costs relating to any proof produced at the direction of the arbitrator are borne by employer unless parties agree otherwise or unless claim was filed to harass or was "patently frivolous"). And unless a claim was filed to harass or was "patently frivolous," the Agreement seems to contemplate that the employer will bear the full cost of arbitrator *compensation* as well. *See id.*, "Administrative Fee Schedule for Disputes Arising Out of Employer-Promulgated Plans." Davis is not responsible, at least primarily, for any hearing fees under the rules in effect. *Id.* The court's discussion of the Agreement and the incorporated rules is not meant to suggest that the terms of those documents absolutely foreclose the possibility that Davis could incur substantial costs under this regime; but what the terms of the Agreement and the rules *do* say about likely costs, fees, and expenses would not, in the court's view, "demonstrate that the potential costs of arbitration are great enough

21

to deter [Davis] and similarly situated individuals from seeking to vindicate their . . . rights in the arbitral forum." *Morrison, supra*, at 663. It was incumbent upon Davis to show just that much, and she has not done so.[8]

Accordingly, the court finds that Davis has not met her prima facie burden of showing *evidence* that "the potential costs of arbitration are great enough" to deter Davis and "similarly situated individuals from seeking to vindicate their . . . rights in the arbitral forum" contemplated by this Arbitration Agreement.

### III.

For the foregoing reasons, the court does not address Davis's argument regarding the severability or non-severability of particular provisions of the Arbitration Agreement. Pl.'s Mem. at 12. On the other hand, the court rejects Morningside's effort to obtain a preemptive judgment in court on the ground that Davis did not file for arbitration within the ninety (90) day time limit. Def.'s Reply at 11. That effort seems to ignore Morningside's waiver of the right to litigate the timeliness defense in court, *see* Agreement, which is no less enforceable than Davis's waiver of her right to bring a lawsuit covered by the Agreement.

---

[8]Davis appears to recognize that her proof of likely costs is slim, if not nil, thus inviting the court to "allow the opportunity to gather such evidence." She finds support for that late request in *Blair v. Scott Specialty Gases*, 283 F.3d 595, 610 (3d Cir. 2001). In *Blair*, the "such evidence" to which the Third Circuit referred was simply the evidence required by *Green Tree Fin. Corp.*, and the court of appeals there was simply acknowledging that *Green Tree Fin. Corp.* had not been issued when the parties were before the district court. The Third Circuit thus allowed "some discovery" on that narrow issue in those unique circumstances. *See* Blair, 283 F.3d at 610. Blair does not, however, interpret *Green Tree Fin. Corp.* as a case about the right to ongoing discovery rather than a case about when the likely costs of arbitration can actually prevent arbitration from being an effective substitute for litigation. *But see* Pl.'s Mem. at 11. Neither does this court.

Although the court cannot conclude, as a matter of federal arbitration law, that the ninety (90) day time limit is *per se* unenforceable, there are a number of legal and equitable reasons why an arbitrator might decide not to enforce the limit on the facts of this case.  And, the application (or not) of that limit is precisely the type of issue that presumably should be decided by the three arbitrators under the parties' equally-binding Agreement. Morningside's reliance on *O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341 (6th Cir. 1988) for the opposite conclusion is misguided in light of *Howsam v. Dean Witter Reynolds*, 537 U.S. 79,83–86 (2002).  In *O'Neal*, the Court of Appeals for the Sixth Circuit affirmed dismissal of a lawsuit that had been filed outside of the parties' contractually-provided time limit for the filing of arbitration claims.  860 F.2d at 1353.  The parties did not raise, and the court of appeals did not discuss, the "who decides timeliness" issue in that case, s*ee id.*, and this court does not read *O'Neal* to require the entry of judgment for Morningside.  But even if *O'Neal* supported Morningside, *Howsam* subsequently confronted the issue directly, and the United States Supreme Court there held that "allegations of waiver, delay, or like defenses *to* arbitrability" were issues of procedural arbitrability and were presumptively for arbitrators to decide.  537 U.S. at 84 (internal quotation marks and citation omitted); *id.* at 85 ("[W]hether prerequisites such as *time limits* . . . have been met[] are for the arbitrators to decide.") (internal quotation marks and citation omitted); *Tennessee Valley Trades & Labor  Council v. Day & Zimmerman NPS, Inc.*, No. 3:04-cv-0391, 2006 U.S. Dist. LEXIS 8733, at *29 (M.D. Tenn. Feb. 21, 2006) (unpublished memorandum opinion) (applying *Howsam*'s distinction between procedural and substantive "gateway" issues of arbitrability);

23

*see also Smith v. Dean Witter Reynolds, Inc.*, 102 Fed. App'x 940, 944 (6th Cir. June 23, 2004) (unpublished opinion) (finding plaintiff's "concession" that suit was not filed within contractual time limit an insufficient basis to enter judgment for defendant).  Morningside simply ignores this binding Supreme Court precedent distinguishing between gateway issues of procedural and substantive arbitrability.  Morningside's timeliness defense is of the former type.

IV.

The Motion to Dismiss, or in the Alternative, for Summary Judgment; or in the Alternative, to Stay Further Proceedings and Compel Arbitration[9] is GRANTED IN PART.  Davis's state law retaliatory discharge suit is STAYED, and the parties are ORDERED proceed in accordance with the Arbitration Agreement.[10]  The parties are also ORDERED to advise the court of the status of this controversy no later than thirty (30) days after the day the arbitration is concluded.

IT IS SO ORDERED.

 s/ **James D. Todd**

JAMES D. TODD
UNITED STATES DISTRICT JUDGE

---

[9]Dkt. # 5.

[10]9 U.S.C. § 3.